# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF GEORGIA
# ALBANY DIVISION

| | | |
|---|---|---|
| KIMBERLY GIBSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | NO._____ |
| | ) | |
| THE HONORABLE CARLOS DEL TORO, | ) | |
| SECRETARY OF THE NAVY | ) | |
| | ) | **JURY TRIAL DEMAND** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Kimberly Gibson ("Plaintiff" or "Ms. Gibson") submits the following Complaint against Defendant The Honorable Carlos Del Toro, Secretary of the Navy ("Defendant").

## INTRODUCTION

1.     During Ms. Gibson's employment with Defendant as a civilian employee at Marine Corps Logistics Base Albany, her supervisor, Marcus White, subjected Ms. Gibson to severe and pervasive sexual harassment including, but not limited to, unwelcome sexually suggestive and inappropriate comments and overtures.

2.     After Ms. Gibson rebuffed White's unwanted and unwelcome conduct

and engaged in protected activity, White and other employees of Defendant retaliated against Ms. Gibson by, among other things, refusing to ensure Ms. Gibson's physical safety despite repeated reports of indirect threats and workplace violence; forcing Ms. Gibson to report to perpetrators named in an active EEO complaint; subjecting her to multiple unfounded employment actions to severely reduce and withhold her pay; denying Ms. Gibson access to the EEO process by failing to investigate or process her complaint through established guidelines; denying, then interfering with, Ms. Gibson's right to FMLA; breaching the Privacy Rights Act by providing Ms. Gibson's personal identifiable information to the individual accused of sexual harassment; subjecting her to a sham investigation based on pretextual allegations of "misconduct" and pretextually terminating her employment.

3.    Defendant also subjected Ms. Gibson to racial discrimination and sex discrimination when it paid her less than similarly situated individuals.

4.    Ms. Gibson brings this action against Defendant for sex discrimination (including but not limited sexual harassment), race discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Ms. Gibson seeks injunctive and declaratory relief, back pay and lost benefits, front pay or reinstatement, compensatory damages, and attorney's fees

and costs of litigation to remedy these federal law violations.

## JURISDICTION AND VENUE

5.      Ms. Gibson's Title VII claims present federal questions over which the Court has jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. §2000e-5(f)(3).

6.      This Court is an appropriate venue for all of Ms. Gibson's claims because a substantial majority of events giving rise to Ms. Gibson's claims occurred in this judicial district.

## ADMINISTRATIVE PROCEEDINGS

7.      Ms. Gibson filed a timely formal complaint of discrimination with the Equal Employment Opportunity ("EEO") Division Office at Marine Corps Logistics Base Albany.

8.      More than 180 days have passed since the filing of Ms. Gibson's EEO complaint, and the agency has not taken final action on Ms. Gibson's EEO complaint. Therefore, under 42 U.S.C. § 2000e-16(c), she has exhausted her administrative remedies and may file this Complaint.

9.      Ms. Gibson has complied with all other conditions precedent to the institution of this lawsuit.

## PARTIES

10.     Ms. Gibson is a resident of Georgia and submits herself to the

jurisdiction of this Court.

11.    Ms. Gibson is a Black woman.

12.    Ms. Gibson was employed by Defendant at all times material to this Complaint, until Defendant terminated her employment effective January 14, 2022.

13.    At all relevant times, Ms. Gibson was an "employee" of Defendant within the meaning of Title VII, 42 U.S.C. § 2000e(f).

14.    Defendant is subject to the jurisdiction of this Court and may be served with process at the following location: General Counsel of the Navy, Naval Litigation Office, 720 Kennon St., SE, Room 233, Washington Navy Yard, DC 20374-5013.

15.    Defendant was at all relevant times an "employer" under Title VII, 42 U.S.C. § 2000e(b).

## FACTUAL ALLEGATIONS

*Ms. Gibson Begins Working and is Subjected to Unwelcomed Sexual Harassment*

16.    Ms. Gibson was employed by Defendant as a civilian employee beginning Sept 3, 2019 at MCAS Yuma in Yuma, AZ and transferred to MCLB Albany on or about August 23, 2020.

17.    At all relevant times for this action, Ms. Gibson held the position of Behavioral Health and FAP (Family Advocacy Program) Manager, NAF 4* at

Marine Corps Logistics Base Albany.

18.    Ms. Gibson's job duties as Behavioral Health Manager generally involved serving as the installation's Clinical Director for all non-medical mental health services, including programs of substance abuse, domestic violence, child abuse, child neglect, problematic sexual behavior in children, general counseling, victim advocacy, new parent support program and psychoeducational prevention programs.

19.    At all times material to this Complaint, Defendant had control over Ms. Gibson's employment and the terms and conditions thereof.

20.    Beginning approximately October 2020, Ms. Gibson begin to suffer sexual harassment at the hands of White, her supervisor.

21.    White routinely subjected Ms. Gibson to unwelcome sexually suggestive and inappropriate comments, overtures, and harassment.

22.    After Ms. Gibson had moved from Arizona and was beginning her work in Albany, White told her he believed God had dropped her into his spirit and that he had asked God if God was sending Ms. Gibson for more than the job and was in fact sending him a blessing.

23.    White insisted on calling Ms. Gibson "pet names" like "Queen" and "Yvette" despite her telling him that she did not like this and that he should call her

only Kimberly or Ms. Gibson.

24.     White sent Ms. Gibson a text message in which he wrote that he promised to be careful with her heart.

25.     White told Ms. Gibson that he would know her scent anywhere.

26.     White stated that he could be in a crowded room, in the dark, with his hands tied behind his back and would be able to pick out Ms. Gibson  by her scent.

27.     One day, Ms. Gibson was wearing open toe shoes and White stopped their work conversation to tell her that that he really liked her pedicure.

28.     Another time, White told Ms. Gibson that he preferred that women wax their legs.

29.     White commented several times on Ms. Gibson's clothing and that he loved the way she dressed and how feminine she was.

30.     White commented that a particular dress Ms. Gibson was wearing really complimented her figure.

31.      White frequently remarked to Ms. Gibson about having large hands, which she perceived as him making an insinuation about his penis size.

32.     White made numerous remarks to Ms. Gibson that other women on the base and elsewhere were pursuing him romantically.

33.     In one of these remarks, White gave details of an encounter with

another woman in which he said he was lying across his hotel bed in his underwear when the woman arrived.

34.     Another time, White told Ms. Gibson that a woman stopped him at a gas station to say that he had a nice car, and all he needed was a pretty woman in the front seat.

35.     White would frequently tell Ms. Gibson stories about his three ex-wives, claiming that he was a good and gentle husband who had been stuck with unfaithful or emotionally unstable wives.

36.     When Ms. Gibson asked what White's daughter thought about his interest in Ms. Gibson, since Ms. Gibson was close to his daughter's age, he said that it was none of his daughter's business.

37.     White also said that his daughter had tried to set him up with women around his age, but that he did not want an "old woman."

38.     White constantly pressured Ms. Gibson into having an intimate relationship with him, even after Ms. Gibson clearly stated that she was not interested.

39.     White continued this unwelcome and harassing behavior and stated his desire to start a family and father a child with Ms. Gibson.

40.     White repeatedly texted suggestive and personally uncomfortable

messages to Ms. Gibson and frequently called her to engage in personally uncomfortable conversations.

41.     White repeatedly told Ms. Gibson that the building in which she worked was very remote, that anything could happen out there, and that no one would know.

42.     White, under the guise of offering himself as a safety resource to "check in" on Ms. Gibson, told Ms. Gibson of the possibility of her being physically attacked.

43.     On more than one occasion, White went so far as to express his supposed "concern" about Ms. Gibson becoming the victim of a sexual assault and that she would not be able to help anyone else in her job if she were traumatized by such an attack.

44.     White also told Ms. Gibson that she could be targeted for an assault if it were known that she lived alone.

45.     White told Ms. Gibson he had served as a "spiritual advisor" to another woman who had been attacked in her home and had only narrowly escaped being sexually assaulted.

46.     White offered himself to be available as supposed protection for Ms. Gibson when contractors were scheduled to be at her home.

47.     When Ms. Gibson refused White's offers of help, he would make comments such as, "Since you won't let me be your husband…" or "Since you won't let me be your friend…"

48.     In an effort to make White stop his unwanted romantic advances, Ms. Gibson met him at a restaurant and told him that she did not want to be his fourth wife, she did not want to have children with him, and that he was actually older than her father.

49.     During the dinner, Ms. Gibson asked White if her lack of interest in him would cause problems with her job. White said no, and that he was old enough to put Ms. Gibson's feelings above his desires.

50.     However, after Ms. Gibson rebuffed White's unwanted advances, he continued to share stories about other women who were interested in him and make comments about the risks of potential attacks against Ms. Gibson.

51.     Ms. Gibson reasonably interpreted White's remarks, including those referring to the possibility of her being assaulted and needing his "protection," as threatening her with harm if she did not submit to his unwanted advances.

52.     In addition to threatening her safety after she refused his romantic advances, White made disparaging comments about Ms. Gibson's job performance to upper management, including his immediate supervisor, Craig Pruett, Marine

Corps Community Services Deputy Director.

53.    White falsely portrayed Ms. Gibson as someone who was unwilling to work hard, producing sloppy work product, and not a team player.

54.    White withheld resources and information Ms. Gibson needed to effectively do her job.

55.    White tried to change Ms. Gibson's work conditions and reporting time, acting as though she had not received authority to telework or start her day in-office at 9AM, even though she had.

56.    White interfered with Ms. Gibson's ability to take sick leave and attempted to keep tabs on her physical whereabouts by claiming that she needed to be available in Albany in case of a "program emergency," although Ms. Gibson did not work in an on-call position.

57.    As a result of Ms. Gibson's romantic rejection, White would start arguments with her and act hostilely toward her.

58.    White also took away elements of Ms. Gibson's management authority over the counseling center. For example, he would make hiring decisions for Ms. Gibson's department, usurping her power to select and hire her employees.

59.    As a result of White's disparaging remarks, Pruett's conduct toward Ms. Gibson also became more confrontational and hostile.

60.    For example, Pruett came to Ms. Gibson's office on April 8, 2021, visibly angry and demanding to know where Ms. Gibson was.

61.    Ms. Gibson's staff told her that Pruett was so aggressive that he slammed into a door in an attempt to burst through it while he was looking for Ms. Gibson.

62.    When Ms. Gibson returned from a presentation on the base shortly thereafter and spoke with Pruett, he was visibly agitated, red in the face, and used an aggressive tone of voice.

63.    Based on this incident and White's earlier threatening statements about the possibility of her being assaulted, Ms. Gibson was concerned that White had escalated the situation so much that she was in physical danger from him and possibly Pruett.

64.    Ms. Gibson was concerned about her safety and how White's conduct was affecting her department's operations, but she was also worried about how the base's leadership would react if she reported the sexual harassment she had experienced.

65.    Ms. Gibson later learned that White had previously been removed from the building where she worked due to a sexual harassment complaint from another employee.

66.     Further, Ms. Gibson learned that her predecessor had complained about White's sexually inappropriate behavior.

67.     But despite Defendant's knowledge of these earlier complaints about White and sexually inappropriate behavior, it still promoted him to Program Director over Sexual Assault and Sexual Harassment.

68.     Ms. Gibson spoke with the base's Chaplain about her concerns, and he offered to give Leonard Housley, the Executive Director of the base, a "heads up" that an employee may be reporting sexual harassment.

*Ms. Gibson Reports White's Harassment and is Subjected to Ongoing Retaliation*

69.     The Chaplain told Ms. Gibson that Housley was receptive to her concerns, so Ms. Gibson decided to speak with him and report White's conduct.

70.     On or about April 20, 2021, Ms. Gibson reported White's sexual harassment to Housley.

71.     To Ms. Gibson's surprise, however, Housley reacted angrily, and instead of acting on her complaint, Housley attempted to intimidate her out of filing a complaint.

72.      Housley slammed his pen on the table, yelled at Ms. Gibson, implied that he would try to find reasons to discipline her, and discouraged her from seeking legal counsel.

73.   Nevertheless, Housley finally agreed to replace White as her immediate supervisor, initially suggesting Pruett.

74.   When Ms. Gibson objected based on Pruett's April 8 outburst in her office, Housley yelled, "You can't go around saying everyone is hostile!"

75.   Housley then stated, "with something like this, you just better make sure your hands are clean" or words to that effect, implying that if Ms. Gibson were to proceed with her complaint against White, her job would somehow be at risk or she would be subjected to unwarranted scrutiny.

76.   Housley discouraged Ms. Gibson from obtaining legal counsel by stating that "attorneys are not your friend" and are very expensive. He then told her he knew someone who had to sell his house just to pay his attorney's fees.

77.   Housley also ignored Ms. Gibson's reports of her safety concerns and failed to initiate a Violence Protection Program ("VPP") or otherwise implement an appropriate safety plan.

78.   Ms. Gibson had to plead with Housley to at least direct White not to have verbal contact with her.

79.   When it was clear that Ms. Gibson intended to pursue her complaint, Defendant subjected her to continuous retaliation.

80.   In retaliation for Ms. Gibson's rebuffing his romantic interest and

reporting his harassing behavior, White did not process her planned pay raise in April 2021.

81.    White withheld information from Ms. Gibson that she needed to perform her duties and gave her a lowered and unjustified performance evaluation rating.

82.    At the time White gave Ms. Gibson the unjustifiably low performance evaluation, he was under investigation for sexually harassing Ms. Gibson. He had been verbally instructed to have no verbal communication with her and was not to exercise any supervisory authority over her—including giving performance evaluations.

83.    During that time, Housley had delegated supervisory duties over Ms. Gibson to Deborah Lampkin, Marine Corps Community Services Director ("MCCS Director"), who, as set forth herein,  also engaged in ongoing retaliation against Ms. Gibson.

84.    In addition to serving as Ms. Gibson's temporary supervisor while her complaint was pending, Lampkin, in her capacity as MCCS Director, was involved in the investigation of Ms. Gibson's complaint.

85.    Lampkin pressured Ms. Gibson to retract her complaint.

86.    On May 4, 2021, Ms. Gibson was supposed to have a meeting with

Lampkin, in her capacity as Ms. Gibson's temporary supervisor, in order to address Ms. Gibson's request for program support and management authority.

87.     Instead, however, Lampkin and Pruett both came to Ms. Gibson's office and ambushed her with an alleged list of concerns about her performance, falsely implying that she had not been fulfilling all her assigned tasks.

88.     Lampkin then brought up Ms. Gibson's complaint against White. She said she would directly handle the "situation" with White herself, and instructed Ms. Gibson to send an email to the base's general counsel, Tracey Madsen, copying Lampkin, and claiming that the complaint was a misunderstanding.

89.     Lampkin told Ms. Gibson that if she re-characterized the complaint in the manner Lampkin was instructing her to do, Lampkin would handle the matter and Ms. Gibson would be placed on a leave of absence during this time.

90.     A week later, another attorney for Defendant, Elise Jones, told Ms. Gibson in an email that her complaint was a serious matter, and that Defendant would go forward with an investigation.

91.     On or about June 3, 2021, Gibson discovered that Pruett also falsely reported Ms. Gibson for breach of confidential information on or about early May 2021 and attempted to have the installation escalate this false claim against her under the formal data breach protocol.

92.    On May 6, 2021, Pruett also yelled at Ms. Gibson during a telephone conversation in which Lampkin was present.

93.    After being asked a question, Ms. Gibson was responding and Pruett aggressively yelled, "Stop interrupting! God, Kimberly, will you stop interrupting!"

94.    Ms. Lampkin did not intervene or address Pruett's behavior.

95.    On June 9, 2021, White further retaliated against Ms. Gibson by submitting a written communication to HQMC Clinical Division in which White intentionally misrepresented facts in an attempt to disparage Ms. Gibson and her work quality.

96.    White strongly suggested that Ms. Gibson had falsified a case involving problematic sexual behavior in a child.

97.    Further communication exchange from HQMC included Ms. Gibson. It was revealed that White's statements about Ms. Gibson were unfounded, which led to White emailing a retraction.

98.    Achaia Graham, Director of the Human Resources Department for MCLB Albany, provided White with personal information concerning Ms. Gibson, including Ms. Gibson's social security number and other information that, if misused, could subject Ms. Gibson to any number of adverse events.

*The Base EEO Office Receives Ms. Gibson's Complaint, But Does Not Conduct an Investigation.*

99.    On or about June 9, 2021, following her retention of counsel, Ms. Gibson contacted the base EEO office requesting a status update about the investigation of White and to notify the EEO office about the ongoing harassment and retaliation she was suffering.

100.   In response, the EEO advised Ms. Gibson that neither Housley nor Jones, nor anyone else had reported the complaint she made in April to the EEO office, and the EEO office had to date her complaint from June 9, 2021. Defendant's refusal to forward or otherwise address or escalate Ms. Gibson's complaint delayed the process by several weeks.

101.   Defendant permitted Albany EEO employee Yome Kamara to handle Ms. Gibson's complaint even though he had twice expressed romantic interest in Ms. Gibson, asking for her personal number and for social outings outside of work, and been turned down by Ms. Gibson.

102.   The EEO rejected Ms. Gibson's request that it reassign her complaint to a disinterested investigator.

103.   The Acting EEO Manager of MCAS Cherry Point was brought into the discussion, but Defendant decided to permit Kamara to retain the complaint.

104.   Moreover, the Albany EEO office did not conduct any investigation:

it never gave Ms. Gibson the opportunity to submit evidence in support of her complaint, repeatedly missed EEO deadlines for progressing her complaint, never interviewed her, and yet, issued Ms. Gibson a final interview letter even though no interview had taken place.

*Retaliation against Ms. Gibson Escalates*

105.   After the EEO entered Ms. Gibson's complaint, Defendant continued to subject Ms. Gibson to ongoing and escalating retaliation.

106.   In July 2021, MCLB Albany began a campaign of intentionally placing Ms. Gibson in AWOL status erroneously, which severely reduced or completely eliminated her paychecks.

107.   White had previously authorized Ms. Gibson to work an alternative schedule due to the irregular hours and demands of her position.

108.   After Ms. Gibson rebuffed his romantic interest, however, White attempted to retract this and falsely alleged that Ms. Gibson was arriving at work late.

109.   Lampkin, or the base's finance manager at Lampkin's direction, would intentionally re-code Ms. Gibson's time in the payroll software as AWOL.

110.   Because AWOL constitutes misconduct, the "AWOL" designation is typically accompanied by Human Resources disciplinary action for the failure to

report for work.

111.   Neither Human Resources nor any other members of base leadership ever contacted Ms. Gibson about allegedly going AWOL, never took disciplinary action against her for allegedly going AWOL, and on information and belief, there is no record in Ms. Gibson's personnel file reflecting action taken for her allegedly going AWOL.

112.   Employees do not receive any payment for time coded as AWOL in the payroll system.

113.   Defendant wrongly coded time as AWOL including days when Ms. Gibson was teleworking, attending mandatory training sessions, barred by building staff from entering her office, taking time off pursuant to FMLA, or even sitting at her desk.

114.   Ms. Gibson contacted numerous people and departments—including Housley, Lampkin, the base's finance manager, employees with MCCS' Business Division, base EEO, and even Human Resources at the Marine Corps' East Coast Regional Headquarters at Camp Lejeune—advising that her paychecks had been wrongful withheld based on false AWOL designations, and that she believed this was retaliatory conduct intended to cause her financial hardship for engaging in protected activity.

115.   None of the people Ms. Gibson contacted took any action to correct prior AWOL designations or to stop this from happening in the future.

116.   During this time, Ms. Gibson also continued to reasonably fear for her safety due to White's threats of physical and sexual assault at the workplace, as well as Pruett's physically aggressive behavior.

117.   Ms. Gibson reported her safety concerns to the EEO office, Lampkin, Human Resources, Ms. Madsen, and the base's Provost Marshall Officers ("PMO"), but Defendant did nothing to meaningfully address the issue.

118.   For instance, on July 22, 2021, Lampkin emailed Ms. Gibson and indicated that she would not authorize safety planning because Lampkin did not believe that she or Pruett constituted a safety threat to Ms. Gibson, since neither of them had threatened her.

119.   However, Lampkin's email did not address, or even acknowledge, White's threats.

120.   Moreover, Defendant authorized Lampkin herself to make this determination, even though she was specifically named in Ms. Gibson's complaint.

121.   Additionally, Lampkin permitted White to resume electronic contact with Ms. Gibson, despite her previous assurances that she would handle the matter.

122.   Because the base had refused to put a safety plan in place, Ms. Gibson

contacted Brigadier General Daniel B. Conley and requested a formal safety plan to ensure her safety aboard the installation.

123.   Defendant did nothing to meaningfully address this request and Ms. Gibson was left vulnerable and under the supervision and authority of individuals who had made indirect physical threats and actively harassed her.

124.   On July 1, 2021, Ms. Gibson sent an email to Dennis Ray, HQMC Personnel Branch Head at Quantico, reporting the breach of her protected information and MCCS Albany's refusal to redress this misconduct.

125.   Ray directed Ms. Gibson to report her concerns to Patricia Turner and Cathi Marshall of the newly-appointed Human Resources Department at Camp Lejeune.

126.   On July 2, 2021, Ms. Gibson forwarded her email exchange with Ray to Turner and Marshall, and formally requested that Camp Lejeune address the issue.

127.   Marshall called Ms. Gibson on July 13, 2021, but would not commit to taking any action about the breach of Ms. Gibson's protected information.

128.   Ms. Gibson followed up by email that same day.

129.   Nevertheless, on information and belief, Defendant never took any meaningful action in response to Ms. Gibson's formal report.

130.   On or about August 2, 2021, Ms. Gibson contacted Lampkin, invoking her right to take leave pursuant to FMLA. Lampkin ignored this communication and Ms. Gibson's emails following up on her FMLA request.

131.   On or about August 3, 2021, Ms. Gibson reached out to Camp Lejeune HR about her FMLA request.

132.   This email included a letter from Ms. Gibson's doctor notifying the base that she was removing Ms. Gibson from work duties due to a serious medical condition.

133.   Inexplicably, Camp Lejeune HR Director Patricia Turner forwarded Ms. Gibson's medical letter to Lampkin, despite knowing that Lampkin had been named in Ms. Gibson's EEO complaint and that Ms. Gibson had reported Lampkin's ongoing retaliation against her.

134.   Unsurprisingly, Lampkin took no action to accommodate Ms. Gibson's FMLA request.

135.   On an earlier occasion, however, when a subordinate of Ms. Gibson's had raised a complaint regarding a disability issue and submitted a formal EEO reasonable accommodation ("RA") request, Lampkin took immediate action.

136.   Moreover—in stark contrast to her treatment of Ms. Gibson's complaint of sexual harassment. Lampkin was an aggressive advocate for that

employee's RA request throughout the process.

137.   Moreover, Lampkin handled another employee's FMLA leave request directly, in her capacity as that employee's supervisor. Yet when Ms. Gibson requested that Lampkin—then Ms. Gibson's direct supervisor—approve her request for FMLA leave, Lampkin ignored her, or told her that she could not assist, and that Ms. Gibson would have to proceed through the EEO.

138.   On August 6, 2021, Ms. Gibson was denied access to her office and deliberately isolated in the lobby of her building.

139.   Only two other staff members were present in the building.

140.   Rather than allow Ms. Gibson entry, one staff member, Ms. Mercer, telephoned a member of MCCS leadership and then relayed to the other employee present, Willie McNair, that Ms. Gibson was not to be admitted to her own office but was to wait in the lobby for that individual from leadership to arrive.

141.   McNair could not tell Ms. Gibson who Mercer had called. However, Ms. Gibson reasonably believed the person on the other end of the phone to be either Pruett or White based on their authority to give such instructions and their presence on the base.

142.   Within minutes, Ms. Gibson discovered that both staff members had exited the building by the rear entrance and left the building unlocked.

143.   At this point, Ms. Gibson was alone in a remote, unlocked building, potentially about to be confronted by either White or Pruett—the two individuals she had already accused of harassment and retaliation. Defendant's failure to implement safety measures for Ms. Gibson's protection—despite her repeated requests—left Ms. Gibson vulnerable to harm by two individuals who had previously threatened or physically intimidated her.

144.   Ms. Gibson immediately notified the Base Attorney, Tracy Madsen, about the incident. Defendant yet again did not implement a safety plan for Ms. Gibson.

145.   Ms. Gibson, with documentation from her physician, was forced to take FMLA leave. Ms. Gibson provided the necessary form and email communication to Lampkin and Camp Lejeune Human Resources.

146.   However, Ms. Gibson was ignored, denied all counseling to discuss FMLA, or and given no guidance about transitioning her into this leave.

147.   Defendant repeatedly told Ms. Gibson that a meeting would be scheduled to provide this obligatory process. However, Ms. Gibson completed 30 days of full time FMLA leave, with no meeting ever held or scheduled.

148.   After 30 days, Ms. Gibson's physician recommended that she return to work, with parameters detailing restrictions on her return—including that she

telework.

149.   Additionally, MCCS Albany still had not put any kind of protection plan in place for Ms. Gibson, such that she felt safe on the base. Teleworking was therefore her only viable option for returning to work.

150.   Although Ms. Gibson submitted the proper paperwork with these updated parameters, Lampkin, Turner, and Marshall did not acknowledge or process Ms. Gibson's form invoking intermittent FMLA leave.

151.   On September 17, 2021, Ms. Gibson attempted to return to her job by teleworking—as directed by her doctor— and to use intermittent FMLA leave as needed, but Lampkin and Human Resources delayed processing this request for a reasonable accommodation.

152.   Despite the fact that, Ms. Gibson was working and attending mandatory training sessions—albeit remotely—from September 17, 2021 onward, Lampkin treated Ms. Gibson as though she had never returned to work.

153.   During the period Ms. Gibson took FMLA leave and teleworked, Lampkin continued to place Ms. Gibson in AWOL status in the payroll system— even for hours she worked.

154.   When Ms. Gibson contacted Turner and Marshall about the AWOL status, they responded by supporting Lampkin's position that Ms. Gibson had not

returned to work.

155.   Turner and Marshall did not address the fact that Lampkin had wrongly withheld paychecks from Ms. Gibson by miscoding her hours teleworked as AWOL.

156.   By this time, Lampkin had already improperly exhausted every single hour of Ms. Gibson's leave of all types, including vacation and sick time, despite the fact that Lampkin never received authorization from Ms. Gibson to do so.

157.   This action was against OPM policy which the MCCS Business Division confirmed. Defendant's actions or deliberate inactions severely limited Ms. Gibson's ability to manage FMLA and would have forced her to return to a hostile environment or take any processed FMLA almost exclusively as unpaid leave.

158.   Ms. Gibson continued to protest this interference with her FMLA and other rights and repeatedly stated in writing to Human Resources, her supervisor and MCCS Business Operations that she believed this to be retaliatory for her engaging in protected activity.

*Ms. Gibson Discovers a Race- and Sex-Based Pay Disparity*

159.   When Defendant hired Ms. Gibson, White, Graham, and Lampkin told her that MCCS Albany could not afford to pay her a base salary of

$80,000.00.

160.   However, Graham advised that they could pay her $72,500.00, and give her $7,500.00 in relocation costs.

161.   White also stated that Defendant could raise her base salary to $80,000.00 in April 2021.

162.   Ms. Gibson accepted the job based on this promise, believing that she was paid at the same level as similarly situated individuals on base.

163.   In or about March 2021, Ms. Gibson discovered that similarly situated white males on the MCCS Albany base were paid more than her.

164.   She also learned that she was the only Black female Behavior Health Manager in the Marine Corps, and that Defendant paid her less than the next lowest paid person in this position.

165.   On July 23, 2021, Ms. Gibson wrote a letter to Lampkin, in Lampkin's capacity as MCCS Director, advising of the missing pay increase and the pay inequity between her and her male counterparts.

166.   Lampkin never acknowledged Ms. Gibson's requests to process the outstanding pay raise and initiate an investigation into sex-based pay discrepancy.

167.   Defendant never honored the pay increase it promised Ms. Gibson.

168.   On September 17, 2021, Ms. Gibson filed her formal complaint of

discrimination with the EEO office.

169.   Ms. Gibson also reported the ongoing mishandling of her complaint to Cherry Hill EEO, the regional Marine Corps Camp Lejeune EEO office, and the Washington, DC office of the EEOC.

*Defendant Engages in Further Retaliation Culminating in Ms. Gibson's Termination*

170.   Due to Defendant's refusal to allow Ms. Gibson to telework, Ms. Gibson was forced to return to her office on the base on October 20, 2021.

171.   But because Defendant had refused to implement any safety protocol protecting Ms. Gibson from White and Pruett, Ms. Gibson was left with no choice but to arrange for her own security, and had Captain Jordan, an off duty Sherriff's Department deputy, accompany her when she returned to the base.

172.   On October 20, 2021—the same day Ms. Gibson returned to the base for the first time in two and a half months—Craig Pruett arrived unannounced at the Counseling Center, accompanied by Finance Manager Anna Mettrick.

173.   Because Lampkin had taken temporary leave, Pruett served as Ms. Gibson's temporary direct supervisor at this time—despite the fact that Ms. Gibson's April complaint to Housley expressly stated that Pruett was not an appropriate supervisor due to his aggression and hostility toward Ms. Gibson.

174.   Pruett claimed that he needed to discuss Ms. Gibson's schedule with

her but instead he spent the meeting confronting Ms. Gibson about her security escort, demanding, "Who authorized you having someone here with you?

175.   Ms. Gibson replied that she was not aware of any rule or policy prohibiting her from engaging private security to accompany her to the base, and stated that the Sheriff's Office had provided a courtesy notification to the base that an off-duty officer in a private capacity, would be on base.

176.   Mr. Pruett retorted that he would verify whether the base was notified.

177.   Ms. Gibson questioned the necessity of Pruett's presence in her office to discuss her schedule, since they worked in separate buildings on opposite sides of the base, and she had emailed Pruett with details about her schedule and advising that she was still taking partial FMLA leave, which he could have addressed in a reply or a phone call.

178.   Ms. Gibson informed Pruett that she believed that he had come to her office unannounced and invaded her personal space in a deliberate attempt to physically intimidate her and undermine her access to safety measures.

179.   This exchange occurred in the presence of both Ms. Gibson's Deputy escort and Anna Mettrick.

180.   Pruett acknowledged Ms. Gibson's perception of his behavior and the open EEO complaint against him, apologized, and agreed to leave.

181. Later in the workday, Violence Prevention Program ("VPP") Investigator/MCLB Albany PMO Lieutenant Singleton arrived, unannounced, at Ms. Gibson's office asking her to meet with him.

182. Ms. Gibson advised that this was the first she was hearing of the VPP, and asked to set a meeting for later that day.

183. During their follow-up meeting, Singleton stated that he was there to tell Ms. Gibson about the VPP and inquired if she wanted to participate or give a statement.

184. Ms. Gibson asked why the process had not been initiated sooner, since she had made her first complaint of sexual harassment and safety concerns six months prior.

185. Singleton seemed surprised and uncomfortable by the question, and responded by listing the individual and departments responsible for notifying Ms. Gibson of the program and triggering its investigation, including White, Pruett, Lampkin, Albany HR Achaia Graham, XD Leonard Housley, base EEO, and Camp Lejeune HR Patricia Turner and Cathie Marshall.

186. Ms. Gibson told Singleton that all of those people and departments had been involved in—or the subject of—her complaints, but had never told her about the VPP.

187.   Ms. Gibson told Singleton she wanted to submit a complaint about how those people and departments had intentionally withheld information about the VPP in order to avoid investigation of their misconduct.

188.   Agent Singleton said he would not be addressing Ms. Gibson's concerns because "this wasn't his wheelhouse," and he was set to retire in about a year.

189.   Ms. Gibson stated that she would be participating in the VPP and would submit her statement in writing.

190.   At the end of the day on October 20, 2021, as Ms. Gibson was preparing to depart the base, she and Captain Jordan received a telephone call from the base's Criminal Investigations Division ("CID") office regarding Ms. Gibson's allegations and complaints.

191.   The agent stated that CID and PMO had learned only that day about Ms. Gibson's sexual harassment complaint and her reports about safety concerns and the risk of workplace violence.

192.   Agent Casey stated that he knew that Albany PMO Chief Lamonsz was not aware and Agent Casey would be contacting Chief Lamonsz that evening to discuss.

193.   However, Agent Casey suggested that Ms. Gibson had exaggerated

her concerns, and said, "Come on, Ms. Gibson, you're not really scared or in danger. You don't really believe that. You don't really think something's going to happen on the base."

194.   Ms. Gibson became upset and pointed out how inappropriate it was for law enforcement to minimize her reports and justifiable fear.

195.   Agent Casey apologized to Ms. Gibson, but said her use of private security "did not look good," for Defendant since it was Defendant's responsibility to keep people safe on the base.

196.   Captain Jordan advised Agent Casey that he had already been approved to return the following day to provide security detail for Ms. Gibson, and asked Agent Casey if this was a problem.

197.   Agent Casey stated that it was not a problem, but that the base would now be looking into Ms. Gibson's safety and planned to address it directly.

198.   That same night, however, Chief Hayes of the Dougherty County Sheriff's Department called Ms. Gibson and told her that someone from the base had called Sheriff Kevin Sproul directly, objecting to the presence of a sworn law enforcement officer on the base.

199.   Chief Hayes also told Ms. Gibson that the base said it was now handling Ms. Gibson's safety needs.

200.   Also that night, base attorney, Tracy Madsen, represented that Ms. Gibson's safety concerns implicated national security or other security issues, which required Ms. Gibson's participation and that Ms. Gibson was required to provide a written statement detailing her safety concerns.

201.   Ms. Gibson complied and worked after hours to prepare her written statement.

202.   Later, however, Ms. Gibson learned that the "national security protocol" Madsen had referenced was actually the VPP—a voluntary program.

203.   Additionally, the hours Ms. Gibson reported for preparing the written statement on Madsen's orders were removed from the payroll system by Lampkin, or at her direction.

204.   Although Ms. Gibson worked after hours preparing the statement, Defendant did not compensate Ms. Gibson for this time.

205.   Defendant had said Ms. Gibson should not bring a law enforcement officer back to the base to serve as security, but Defendant did not tell Ms. Gibson that she could not bring any personal security officer with her.

206.   Based on this, Ms. Gibson engaged a private security officer – not a member of law enforcement – to accompany her to the base on October 21, 2021.

207.   That same day, Pruett made yet another unannounced visit to Ms.

Gibson's office.

208.   Pruett did so despite the fact that he and Ms. Gibson had not scheduled a meeting nor had Pruett asked to set a meeting with Ms. Gibson, and he had not otherwise communicated with her regarding a meeting.

209.   Carla "Renee" Wooten, an Administrative Assistant who was working at the front desk (and who reported to Pruett), telephoned Ms. Gibson advising her that Pruett was in the lobby.

210.   When Ms. Gibson asked why, Ms. Wooten said she did not know.

211.   Ms. Gibson was under the impression that Pruett was alone, and Wooten did not tell Ms. Gibson that he was accompanied by anyone, including law enforcement.

212.   It was not until weeks later, when Ms. Gibson received a termination notice dated December 6, 2021, that she was told that Pruett had arrived at the building with PMO Chief Lamonsz.

213.   After Pruett's demeanor the day before, Ms. Gibson was concerned about why Pruett had returned unannounced.

214.   Ms. Gibson telephoned PMO and reported her safety concerns, relaying some of the history of her EEO complaint for sexual harassment, and incidents involving Pruett.

215.   When the PMO officers arrived, Ms. Gibson met with them in her office and they suggested a meeting to address the risk of violence she faced on base, and the base's refusal to provide any safety measures, despite her requests.

216.   Ms. Gibson agreed, but advised that she intended to have her attorney attend the meeting with her.

217.   Pruett was welcome to attend this meeting, and Ms. Gibson never refused to meet with him.

218.   That meeting however, did not transpire; instead, the base attorney initiated a meeting with Ms. Gibson and several other base personnel regarding security and safety concerns.

219.   However, this meeting did not address Ms. Gibson's months of reports about her safety concerns, the potential for workplace violence, or the VPP statement that she provided on October 20, 2021. Instead, the meeting focused on Pruett's alleged safety concerns about Ms. Gibson's private security officer.

220.   Ms. Gibson engaged a security escort only after months during which her concerns about her safety were not addressed.

221.   Yet when Pruett—a white male—complained, claiming that Ms. Gibson's security escort somehow created a workplace safety issue, the base responded immediately.

222.   Following this incident, Ms. Gibson initiated a complaint to the Department of the Navy's Office of the Inspector General.

223.   On October 27, 2021, Turner, Camp Lejeune's HR Director, notified Ms. Gibson that she had been placed on administrative leave, and implied that this was for the purpose of addressing her safety concerns and her request for a formal safety plan.

224.   When Ms. Gibson pressed Defendant to provide a written explanation of the purpose and terms of the administrative leave, Defendant admitted that Ms. Gibson was in fact the subject of an investigation.

225.   Ms. Gibson was never informed of the allegations against her during the investigation and did not have a meaningful opportunity to respond.

226.   Ms. Gibson offered to make herself available with her legal counsel present for an interview and advised that once she was aware of the nature of the investigation, she would submit written responses to any queries presented to her.

227.   On November 4, 2021, Pruett emailed Ms. Gibson instructing her to contact the investigator, Sandy Potts, for an interview. Pruett's email set a date and time for the interview, which had not been coordinated ahead of time with Ms. Gibson.

228.   Ms. Gibson responded, advising that she would reach out to her

attorney to coordinate a mutually agreeable time for the interview.

229.   However, base attorney Tracy Madsen responded that the interview would occur at the originally set time.

230.   Ms. Gibson contacted Potts at the appointed time and telephone number. She left several voicemail messages at that number before Ms. Potts finally called her, advising that Madsen was leading the process, and would need to be consulted to reschedule.

231.   Potts then sent an email to Ms. Gibson falsely suggesting that the interview had been rescheduled for later that day, and implying that Ms. Gibson was unavailable for the originally-scheduled call.

232.   Ms. Gibson responded denying Potts' characterization of the situation, and reminding Potts of her duty as a HR Administrator to provide statutory notices and comply with OPM guidelines.

233.   Potts ignored Ms. Gibson's email and never informed Ms. Gibson of the allegations against her.

234.   Despite OPM limitations to placing an employee on investigative leave, Defendant kept Ms. Gibson on leave for approximately three months.

235.   The adverse action did not comply with how other disciplinary actions of other employees had been handled and did not comply with the required regulations for extension of investigative leave.

236.   On approximately November 12, 2021, Ms. Gibson received a return call about her complaint from the Navy's Office of the Inspector General, during which she described her safety concerns, the stalled EEO process, and alleged misconduct by military command, senior leadership, and the installation's Inspector General.

237.   Ms. Gibson also described how formal complaints had been reported to HQMC, and expressed concern that people in leadership were using their positions to interfere with an investigation.

238.   On November 20, 2021, Ms. Gibson received an email from the Office of the Naval Inspector General advising that the IG would not be pursuing the matter and referred her complaint back to the Marine Corps—the very entity Ms. Gibson had reported to the Naval Inspector General.

239.   Ultimately, the interview was never rescheduled, and Ms. Gibson only learned of the allegations against her when she received the December 6, 2021 Advance Notice of Proposed Disciplinary Action from Pruett (the "Advanced Notice").

240.   The Advance Notice proposed to separate Ms. Gibson from employment, and wrongly alleged that she was insubordinate, unprofessional, and engaged in conduct unbecoming an MCCS employee.

241.   The allegations in the Advance Notice related to Ms. Gibson's attempts to protect herself following the numerous safety and workplace violence concerns she had repeatedly raised, and which went unaddressed for over six months.

242.   Ms. Gibson timely responded to the Advance Notice in a December 13, 2021 letter to Lt. Colonel Joseph Ray.

243.   In her response, Ms. Gibson denied ever refusing to meet with Pruett or anyone else, disputed numerous factual allegations in the Advance Notice, and stated in part that the Advance Notice was a transparent act of retaliation in response to Ms. Gibson's protected EEO activity.

244.   The response also asserted that the Advance Notice was the product of a flawed investigation in which Ms. Gibson was not informed of the allegations against her and did not have a meaningful opportunity to respond.

245.   On January 10, 2022, Lt. Colonel Ray issued a Letter of Decision stating in part that Ms. Gibson would be separated from her employment effective January 14, 2022.

246.   Defendant summarily terminated Ms. Gibson from a management-level role overseeing sensitive client care and mental health records without allowing for transition of client and program records that was accessible only through her.

247.   In addition to underscoring the pretextual nature of the termination, this raises serious concerns about continuity of client care and proper management and handling of mental health records.

248.   On information and belief, Defendant's mishandling of such records had already been highlighted as an installation failure before Ms. Gibson's appointment to the position.

249.   Defendant's treatment of Ms. Gibson—particularly the initiation of the disciplinary process and Ms. Gibson's termination—substantially differs from the treatment of other employees who did not engage in protected activity, including employees holding supervisory positions and/or employees who allegedly engaged in theft of property and client records.

250.   Defendant neither proposed nor pursued a lesser disciplinary measure more proportionate to Ms. Gibson's alleged insubordination, instead terminating her straight away.

251.   Even following Ms. Gibson's termination, Defendant continued to

retaliate against her.

252.   Defendant failed to provide Ms. Gibson any exit process.

253.   Ms. Gibson lost access to health services, including several standing health appointments and flexible spending accounts to cover health needs.

254.   Further, when Ms. Gibson's requested clarification concerning the method of returning her work equipment, Madsen threatened Ms. Gibson with criminal charges, implying that she was attempting to weaponize law enforcement against Ms. Gibson, a Black woman.

255.   Notably, other employees who did not engage in protected activity, but who were suspected of theft of property and client records, were treated with much greater leniency.

256.   For example, Ms. Gibson was physically present on one occasion when HR leadership discussed not involving police in a theft, despite video footage of the incident, due to the potential for agency liability.

257.   Defendant also provided the Georgia Department of Labor with false information about Ms. Gibson's wages and mischaracterized the reason for her separation as misconduct, resulting in the GADOL deeming her ineligible to receive unemployment benefits.

## COUNT I
## SEX DISCRIMINATION (INCLUDNG SEXUALLY HOSTILE WORKING

**ENVIRONMENT) IN VIOLATION OF TITLE VII**

258.   Plaintiff hereby incorporates by reference the preceding paragraphs of the Complaint as if fully restated herein.

259.   Ms. Gibson is an "employee" as defined by Title VII, 42 U.S.C. § 2000e *et seq.*

260.   Defendant is an "employer" as defined by Title VII, 42 U.S.C. § 2000e *et seq.*

261.   Plaintiff was subjected to a sexually hostile work environment by Mr. White, her supervisor, for which Defendant is liable.

262.   Further, Defendant paid Ms. Gibson less than other male individuals in equivalent supervisory positions at the Albany base.

263.   Defendant's actions constitute unlawful intentional sex discrimination in violation of Title VII of the Civil Rights Act, as amended, thus entitling Ms. Gibson to all appropriate relief under the statute.

264.   Defendant's actions were willful, deliberate and intended to cause Ms. Gibson harm and/or were committed with reckless disregard of the harm caused to Ms. Gibson, and were in derogation of her federally protected rights.

265.   As a result of Defendant's unlawful actions, Plaintiff has suffered emotional distress, inconvenience, loss of income and benefits, humiliation, and

other indignities.

## COUNT II
## RACE DISCRIMINATION IN VIOLATION OF TITLE VII

266.   Plaintiff incorporates by reference paragraphs 1 through 258 of the Complaint as if fully restated herein.

267.   Ms. Gibson is Black.

268.   Ms. Gibson is an "employee" as defined by Title VII, 42 U.S.C. § 2000e *et seq.*

269.   Defendant is an "employer" as defined by Title VII, 42 U.S.C. § 2000e *et seq.*

270.   Ms. Gibson was qualified for the position she held with Defendant.

271.   Defendant discriminated against Plaintiff in the terms and conditions of her employment by paying her less than other non-Black behavioral managers.

272.   Defendant's actions constitute unlawful intentional race discrimination in violation of Title VII of the Civil Rights Act, as amended, thus entitling Ms. Gibson to all appropriate relief under the statute.

273.   As a direct and proximate result of the Defendant's actions, Plaintiff has suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

274.   Plaintiff is entitled to an award of back pay and benefits,

compensatory damages, attorney's fees, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of Title VII.

**COUNT III**
**RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

275.   Plaintiff incorporates paragraphs 1 through 258 above as if fully set forth herein.

276.   At all relevant times, Ms. Gibson was an "employee" of Defendant as that term is defined by Title VII, 42 U.S.C. § 2000e et seq.

277.   Defendant was at all relevant times an "employer" as that term is defined by Title VII, 42 U.S.C. §2000e et seq.

278.   During her employment with Defendant, Ms. Gibson engaged in statutorily protected activity by, among other things, complaining of sex discrimination in violation of Title VII, and in filing a formal EEO complaint.

279.   Defendant, through its agents, representatives, and employees, engaged in actions and omissions constituting retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.

280.   As described in more detail in the above paragraphs, Defendant retaliated against Ms. Gibson by, inter alia, denying her a pay raise, removing

management authority and interfering with execution of duties, issuing her a false performance evaluation, denying her protection for her safety concerns, improperly marking her as AWOL, forcing her to use unpaid leave, applying leave to time she had actually worked, subjecting her to a pretextual investigation, and by terminating her employment, all of which altered the terms and conditions of her employment and all of which would have dissuaded a reasonable worker from making or supporting a charge of discrimination.

281.   Defendant lacked any legitimate justification for subjecting Ms. Gibson to the retaliatory actions complained of above and/or any such purported legitimate justifications are mere pretext for retaliation.

282.   The actions of Defendant in subjecting Ms. Gibson to the adverse actions complained of above were willful, deliberate, and intended to cause Ms. Gibson harm and/or were committed with reckless disregard for the harm caused to her thereby, and were in derogation of her federally protected rights.

283.   As a direct and proximate result of Defendant's unlawful retaliatory conduct against Ms. Gibson, and as a direct and proximate result of the violations of her federally protected rights, Ms. Gibson has suffered harm, including but not limited to loss of compensation and benefits and emotional distress.

284.   As a result of the above-pled violations of Title VII, Ms. Gibson is

entitled to recover lost wages and economic benefits of her employment, compensatory damages for emotional distress, reinstatement, reasonable attorney fees and costs and all other legal and equitable relief provided for by Title VII and all statutes providing for relief for violations of Title VII.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a TRIAL BY JURY and the following relief:

(a)   a declaratory judgment that the Defendant has engaged in unlawful employment practices in violation of Title VII;

(c)   an injunction prohibiting Defendant from engaging in unlawful employment practices in violation of Title VII;

(d)   full back pay from the date of Plaintiff's termination, taking into account all raises to which Plaintiff would have been entitled but for her unlawful termination, and all fringe and pension benefits of employment, with prejudgment interest thereon;

(e)   reinstatement or in lieu thereof front pay to compensate Plaintiff for lost future wages, benefits, and pension;

(f)   compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's emotional distress,

suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

(h)  reasonable attorneys' fees and costs; and

(i)  other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Edward D. Buckley.*
Edward D. Buckley
Georgia Bar No. 092750
Thomas J. Mew, IV
Georgia Bar No. 503447
Kathleen B. Hicks
Georgia Bar No. 587883
BUCKLEY BEAL LLP
600 Peachtree Street, NE, Suite 3900
Atlanta, GA  30308
Telephone: (404) 781-1100
Facsimile: (404) 781-1101
edbuckley@buckleybeal.com
tmew@buckleybeal.com
kkacynski@buckleybeal.com

*Counsel for Plaintiff*